**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Floyd RUSSELL,
Defendant–Appellant.**

**No. 96–1309.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 8, 1997.

Decided Sept. 23, 1998.

Janet L. Parker, Asst. U.S. Attorney (argued and briefed), Office of the U.S. Attorney, Bay City, MI, for Plaintiff-Appellee.

Stevens J. Jacobs (argued and briefed), Bay City, MI, for Defendant-Appellant.

Before: MERRITT, JONES, and NORRIS, Circuit Judges.

JONES, J., delivered the opinion of the court, in which MERRITT, J., joined. NORRIS, J. (p. 695), delivered a separate dissenting opinion.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendant Charles Floyd Russell appeals from the district court's judgment sentencing him to the statutory minimum 60 months imprisonment following his guilty plea to manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1). Russell argues that the district court erred in determining that 104 marijuana plants, rather than 96, were discovered during a valid search of his residence and using that figure in computing his sentence. In addition, Russell argues that the court erred in denying various forms of relief from his sentence, including an adjustment based upon acceptance of responsibility, and also downward departures based upon both

the "safety valve" of the Sentencing Guidelines and Russell's physical disability.[1] While we affirm the district court's determinations that Russell was not entitled to a downward departure or adjustment to his sentence, for the following reasons, we nevertheless vacate the sentence imposed below and remand for proceedings consistent with this opinion.

## I.

In 1993, informant James Morrow, who himself is deaf, provided police in Traverse City, Michigan with information implicating Russell and several others concerning the manufacture, use, and distribution of drugs in the local deaf and hearing-impaired community. Using this information, the police obtained and executed a state search warrant on March 4, 1993 at the home of Darren Bedwell and Bonnie Hart. That search recovered 36 marijuana plants, a quantity of processed marijuana, and related paraphernalia. Based on information given by Morrow, as well as the results of the search from the Bedwell/Hart residence, the police subsequently went to the home of Russell and his girlfriend, Karen Merriman, to continue the search. Merriman (who is also deaf) consented to the search of the premises, and the police recovered processed marijuana, related paraphernalia, and at least 104 marijuana plants.

Russell was eventually charged with a six-count indictment. He pleaded guilty to the charge of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1).[2] In the plea agreement, Russell acknowledged that at least 104 marijuana plants were attributed to him and that the minimum statutory sen-

---

1. Russell is deaf. He uses American Sign Language, rather than vocal means, for communication purposes. Russell's attorney repeatedly refers to Russell and others involved in this case as "deaf mutes." While this term may be accurate as a matter of function, it is largely erroneous as a matter of pathology. Most deaf persons have the ability to speak, but for a variety of reasons choose not to do so. Also, because the term "deaf mute" invokes images of helplessness and pity, it is considered offensive among deaf persons. *See generally* Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Communi-*

*ty's Obligation to Comply with the A.D.A.,* 8 J.L. & HEALTH 155, 157–59 (1993–94) (recounting historical development of term "deaf mute").

2. The statute reads:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

21 U.S.C. § 841(a)(1).

tence he could receive was 60 months. However, Russell also reserved the right to contest these conclusions during sentencing. In accordance with the plea agreement, the remaining counts in the indictment were dismissed.

At sentencing, Russell made several challenges to his presentence report, most of which he raises again before this court on appeal. One such challenge was that the presentence report was inaccurate inasmuch as it stated that 104 marijuana plants were recovered from Russell's residence. Russell argued that the correct number, 96 plants, was reflected in the return of the search warrant. Nevertheless, the district court found that 104 marijuana plants had been seized from Russell's residence. Accordingly, the district court imposed the mandatory minimum 60–month sentence upon Russell. The court also denied Russell's request to be sentenced within the guideline range. Russell filed a timely appeal to this court.

## II.

■ Russell first challenges the district court's finding that 104 marijuana plants were discovered at his residence by the police during their March 4, 1993 search. This court will give due deference to a district court's application of the Sentencing Guidelines to the factual situation found to exist and will review such a decision only for clear error. *See* 18 U.S.C. § 3742(e); *United States v. Hamilton*, 929 F.2d 1126, 1130 (6th Cir.1991). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 365, 68 S.Ct. 525, 92 L.Ed. 746 (1948). All such findings of fact that are crucial to a determination of a defendant's base offense level and criminal history category must be based upon a preponderance of the evidence. *United States v. Smith*, 39 F.3d 119, 122 (6th Cir.1994); *United States v. Watkins*, 994 F.2d 1192, 1195 (6th Cir.1993); *accord United States v. Baro*, 15 F.3d 563, 569 (6th Cir.1994) (sentencing court's estimate of drugs must be supported by a preponderance

of the evidence when court unable to determine exact amount of drug quantities seized), *cert. denied* 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994). "Where the amount of drugs involved is uncertain, the court is urged to 'err on the side of caution' and only hold the defendant responsible for that quantity of drugs which 'the defendant is more likely than not responsible.'" *United States v. Bingham*, 81 F.3d 617, 625 (6th Cir.1996) (*quoting Baro*, 15 F.3d at 568–69).

■ Additionally, a defendant may only appeal his sentence on the grounds that it 1) was imposed in violation of law, 2) was imposed as a result of an incorrect application of the guidelines, 3) represented an upward departure from the applicable guideline range, or 4) is a plainly unreasonable sentence imposed for an offense for which there is no sentencing guideline; the defendant may not appeal a sentence within the prescribed guideline range. 18 U.S.C. § 3742(a); *United States v. Lively*, 20 F.3d 193, 196–97 (6th Cir.1994); *United States v. Lavoie*, 19 F.3d 1102, 1103 (6th Cir.1994). Thus, the court of appeals has jurisdiction over a defendant's appeal "when that defendant identifies a specific legal error in the formulation of his or her sentence, and alleges that the sentencing guidelines have been incorrectly applied[.]" *Lavoie*, 19 F.3d at 1104.

## III.

■ In this case, Russell argues that the district court should have imposed the sentence under the factual premise that there were only 96 marijuana plants recovered from his residence, not 104. Russell argues that the return of the search warrant only lists 96 plants as having been recovered from the search. The difference is of crucial importance in this case—the 60–month mandatory minimum is effectuated when a perpetrator is caught with "100 or more marijuana plants regardless of weight[.]" *See* 21 U.S.C. § 841(b)(1)(B)(vii). Had the district court determined that only 96 marijuana plants been seized from Russell's residence, Russell would have faced a significantly lower sentence under the guidelines.

In arriving at its finding that 104 plants had been recovered, the district court relied upon an incident report produced by the police on the day of the search. The incident report noted that 96 plants were seized from the main portion of the rear bedroom, and an additional eight plants were recovered from the closet. The district court was persuaded to favor the amount of plants recovered in the incident report over the amount presented in the return of the search warrant report because the former was more "lengthy and detailed" than the latter. J.A. at 174.

Russell acknowledged that there was marijuana in both his bedroom and his closet. He did not proffer testimony that the total number of plants was indeed 96, but instead challenged the reliability of the incident report. The government, in turn, argues that due deference to the district court's factual findings are appropriate in this case. Neither side brings a single case to this court's attention involving the resolution of the issue at hand: when the information contained in the return of a search warrant conflicts with information contained in an incident report, which should prevail?

We believe that the return of the search warrant bears the more reliable number of the amount of marijuana plants recovered at Russell's home and that the district court erred when it favored the incident report. As a preliminary matter, we note that Michigan specifically requires return inventories of items seized pursuant to a search warrant. The relevant statute reads in pertinent part as follows:

> When an officer in the execution of a search warrant finds any property or seizes any of the other things for which a search warrant is allowed by this act, the officer, in the presence of the person whose possession or premises the property or thing was taken, if present, or in the presence of at least 1 other person, *shall make a complete and accurate tabulation of the property and things so seized.* The

officer taking property or other things under the warrant shall forthwith give to the person from whom or from whose premises the property was taken a copy of the warrant and shall give to the person a copy of the tabulation upon completion, or shall leave a copy of the warrant and tabulation at the place from which the property or thing was taken. *He shall file the tabulation promptly with the court or magistrate.*

Mich. Comp. Laws Ann. § 780.655 (West 1998) (emphasis added).[3] There are, of course, sound reasons why the inventory of the items seized should be verified. We have previously observed that a primary purpose of the return requirement is "to allow for *proper identification of property* taken by the police under the warrant and to protect the owner's rights therein." *United States v. Dudek*, 530 F.2d 684, 691 (6th Cir.1976) (emphasis added). An obvious corollary to protecting the owner's rights is that accurate inventory of seized property also insulates the police against false claims, thus giving even the police every incentive to carefully account for every item taken from private premises. Moreover, return of the search warrant promotes the truth-gathering process since it ensures that "the warrant and its affidavit are available to counsel for inspection in preparation for trial." *Id.* While *Dudek* interpreted the return statute of Ohio, we believe that the above purposes are applicable for Michigan's counterpart statute as well.

A police incident report, on the other hand, is often crafted with an eye towards prosecution of the defendant. While we acknowledge that the district court has wide latitude in considering facts at the sentencing stage, we are also mindful that police investigative reports used against a defendant in a criminal trial are generally regarded as unreliable and are excluded as a matter of law as inadmissable hearsay at trial. *See* Fed. R.Evid. 803(8)(B);[4] *see also* Paul F. Roth-

---

**3.** We note that the Federal Rules of Criminal Procedure also require a return to a magistrate following the execution of a federal search warrant. *See* FED R.CRIM.P. 41(d). Rule 41(d) mandates that the federal return "shall be made

promptly and shall be accompanied by a written inventory of any property taken." *Id.*

**4.** Rule 803 makes admissible, *inter alia:*

stein, FEDERAL RULES OF EVIDENCE: RULES OF EVIDENCE FOR THE UNITED STATES COURTS AND MAGISTRATES 384.3 (1997) ("Congress indicated a dislike of the use of law enforcement records against the accused in a criminal case by expressly excluding such records used in such a way from the government records rule."); *United States v. Grady*, 544 F.2d 598, 604 (2d Cir.1976) ("Congress was concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of the crime."). While there was no evidence whatsoever of any bad faith on the part of the law enforcement officers regarding the discrepancy between the two tallies, we also note that the incident report, unlike the return of the search warrant, was not sworn and presented to a judicial official.

Arguably, it could be said in this case that the government was not using the report to prove its case against Russell at all. Instead, the incident report can be said to have been prepared as a disinterested, routine practice of the police to record the number of plants recovered in a lawful seizure. Additionally, at least in this case, because the incident report contains far more detail than the return of the search warrant, it could be said to possess the stronger indicia of reliability between the two documents. Indeed, the detailed nature of the incident report was the primary basis upon which the district court found that 104, not 96, plants were found at Russell's residence.

Nevertheless, the fact remains that the number of plants seized is the very heart of the government's case against Russell at issue. No officer with personal knowledge of the seizure testified to the veracity of the incident report. *Cf. U.S. v. Sokolow*, 91 F.3d 396, 404–05 (3d Cir.1996) (when author of government report personally testifies as to accuracy of report, no hearsay problems in using report against criminal defendant). On the other hand, pursuant to section 780.655, two police officers swore to a magistrate that the material contained in the return of the search warrant was a true and correct tabulation of the items seized at Russell's residence.

The government contends that the information contained in the incident report is correct because it was corroborated by supporting evidence. For example, the government notes that the incident report was consistent with a state police laboratory report which stated that two separate quantities of marijuana were seized from separate locations in the residence, thus supporting the incident report's statement that 96 plants were taken from Russell's bedroom and eight were taken from Russell's closet. Additionally, Russell conceded that marijuana was taken from his closet. However, neither of these points is of any assistance in concluding how many plants were taken from Russell's residence. Videotapes and photographs taken at the scene were similarly unhelpful in obtaining a definitive number of plants seized.

Given the tremendous importance of the factual findings to Russell's sentence, we believe that the district court erred in affording more credibility to the incident report. When an incident report is inconsistent with information contained in a return of a search warrant that has been presented to a magistrate, we believe that the latter is the superior beacon of reliability. To allow unverified incident reports to be the basis for factual determinations at criminal proceedings when contradicted by sworn returns would undermine confidence in the reliability of the judicial system.

Having determined that application of the 60–month statutory minimum sentence was not proper, we must remand the case for further proceedings consistent with this opinion. *See* 18 U.S.C. § 3742(f); *Williams v. United States*, 503 U.S. 193, 199–203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

---

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel* [.]

FED. R. EVID. 803(8) (emphasis added).

## IV.

■ Russell next contends that the district court erred in denying his request for an adjustment based upon acceptance of responsibility under U.S.S.G. § 3E1.1.[5] Although Russell pleaded guilty and apparently cooperated with the police, the district court denied Russell's request for an adjustment because the court found that Russell had not been truthful regarding an automobile incident involving Russell and informant Morrow. On November 8, 1994, nineteen months after the search of Russell's residence, Russell rammed his vehicle into the rear of Morrow's vehicle in an apparent effort to intimidate and harass Morrow. Russell testified (through a sign-language interpreter[6]) that Morrow was the instigator of the incident, and in any event, Russell was unaware at the time that Morrow was the one who informed the police of Russell's illegal activities.

■ The district court's finding regarding acceptance of responsibility is entitled to great deference and is to be reversed only if clearly erroneous. *United States v. Surratt,* 87 F.3d 814, 821 (6th Cir.1996); *United States v. Childers,* 86 F.3d 562, 563 (6th Cir.1996). We cannot say that the district court's finding that Russell was untruthful in his account of the incident was clearly erroneous. The district court assessed Russell's testimony regarding the automobile incident in light of the sworn grand jury testimony of Morrow and a police officer trained in accident reconstruction, as well as from photographs of the scene showing debris and skidmarks. The district court noted that Russell's account of the incident was not consistent with the other surrounding facts of the accident such as photographs, skid marks, Morrow's testimony, and testimony of the officer at the scene. Further, at no point did Russell contend that the interpreting of his testimony was inaccurate. Ulti-

mately, the district court concluded that the "evidence points at a minimum by a preponderance of the evidence ... to a version of this incident which comports with Morrow's original report, that is that he was rear-ended intentionally by Russell within the context of being harassed." J.A. at 197 (Sentencing Transcript). Based on this finding of witness intimidation, we cannot say that the district court's decision to deny an adjustment based upon acceptance of responsibility was improper.

## V.

Next, Russell contends that he should have been granted a downward departure based upon U.S.S.G. § 5C1.2, the so-called "safety valve" provision, which enables a defendant to be sentenced without regard to the statutory minimum sentence if the defendant meets certain criteria. Because we have determined that the district court erred in finding that Russell qualified for the statutory minimum sentence, we find Russell's § 5C1.2 arguments moot.

## VI.

■ Finally, Russell argues he qualifies for a downward departure based upon his deafness pursuant to U.S.S.G. § 5H1.4. The district court indicated that it is without authority to consider § 5H1.4's effect on the case since the court was imposing a statutory minimum sentence upon Russell. However, since we hold that the statutory minimum is inapplicable, section 5H1.4 must be addressed.

The section states in part:

Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical im-

---

5. The government argues that because a statutory minimum sentence overrides any adjustments to a sentence, Russell's downward departure arguments are academic. *See United States v. Haun,* 90 F.3d 1096, 1102 (6th Cir.1996). Since we have determined that the district court erred in applying the statutory minimum sentence in Russell's case, any *Haun* arguments are irrelevant.

6. Russell's attorney insinuates that Russell's status as a "deaf mute" somehow bears relevance to the sincerity of his testimony. We are quite convinced that deaf persons are fully capable of concocting untruthful testimony to the same extent as persons who are not deaf.

pairment may be a reason to impose a sentence below the applicable guideline range; *e.g.,* in the case of a seriously infirm defendant, home detention may be as efficient, and less costly than imprisonment.

U.S.S.G. § 5H1.4. (underline in original). Russell asserts that his deafness coupled with his primary means of manual communication qualifies as an "extraordinary physical impairment." He argues that he can only converse with others knowledgeable in sign language and would not be able to cry for help if he faced attack by other inmates.

■■■ Again, the district court did not explicitly consider whether Russell's disability triggers section 5H1.4. Courts may examine a wide variety of circumstances in determining whether a downward departure is warranted under § 5H1. *See United States. v. Martinez–Guerrero,* 987 F.2d 618, 620 (9th Cir.1993); *United States v. Lara,* 905 F.2d 599, 603–04, (2d Cir.1990) (considering defendant's immature appearance, sexual orientation, emotional fragility, and general vulnerability as § 5H1 factors). We could remand the matter to the district court for additional fact finding, but we think doing such would serve no purpose. We do not believe that deafness, without more, can ever serve as the basis for a § 5H1.4 downward departure.[7]

Indeed, a review of the case law reveals that it is not enough merely to have a disability to qualify for a downward departure under § 5H1.4. Rather, as the guidelines explicitly state, the physical impairment must truly be "extraordinary." This court has previously denied § 5H1.4 relief to defendants, holding that their disabilities were not "extraordinary physical impairments." *See United States v. Thomas,* 49 F.3d 253, 260–61 (6th Cir.1995) (HIV-positive status); *United States v. Harpst,* 949 F.2d 860, 863–64 (6th Cir.1991) (suicidal tendencies and heart problems). *But see United States v. Johnson,* 71

F.3d 539, 544–45 (6th Cir.1995) (remanding to district court for additional factual finding on whether defendant's diabetes, hypertension, ulcers, hypothyroidism, and depression qualified for § 5H1.4 departure). Other courts are in accord with the view that § 5H1.4 relief is extremely difficult to obtain. *See, e.g., Martinez–Guerrero,* 987 F.2d at 621 (legal blindness not an "extraordinary physical impairment"); *United States v. Guajardo,* 950 F.2d 203, 208 (5th Cir.1991) (age, cancer, high blood pressure, fused right ankle, amputated leg, drug dependency insufficient to justify § 5H1.4 relief), *cert. denied,* 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992); *Phillips v. United States,* 836 F.Supp. 965 (N.D.N.Y.1993) (denying § 5H1.4 request by blind prisoner).

In this case, the district court specifically recommended that the United States Bureau of Prisons take Russell's disability into consideration and place him at a facility that is equipped to accommodate his needs. *See* J.A. at 57 (Judgment in a Criminal Case). *Cf. Martinez–Guerrero,* 987 F.2d at 620 (district court relied on Bureau of Prisons' ability to care for defendant in finding that his disability was not an extraordinary impairment under section 5H1.4). Russell does not allege that the prison services have been inadequate to accommodate his disability, nor does he allege that the prison has failed to protect him against any attackers.

Russell cites *U.S. v. Long,* 977 F.2d 1264 (8th Cir.1992), as an example of a court granting a § 5H1.4 downward departure for an extraordinary physical impairment. The Eighth Circuit never specified the exact nature of Long's disability, but affirmed the district court's section 5H1.4 downward departure based upon Long's "physical injuries" and reports from doctors that Long's injuries would leave him particularly vulnerable to victimization and potentially fatal injuries. *Long,* 977 F.2d at 1277–78. Based on

---

7. Our research has revealed only one other instance (an unpublished *per curiam* opinion) in which a defendant with a hearing impairment requested a downward departure under § 5H1.4. *See United States v. Vanegas,* 52 F.3d 309, 1995 WL 221490, 1995 U.S.App. LEXIS 8588 (1st Cir.1995). The defendant in that case, however, was 57 years old and also possessed a prostate condition as well as a hearing impairment. According to the First Circuit, the district court granted the downward departure because of the defendant's "health and age." *Id.* 52 F.3d at 309. As far as the record shows, neither Russell's health nor his age (he was 37 at the time of sentencing) warrant any § 5H1.4 consideration.

these reports, the district court in *Long* concluded that "the imposition of a term of imprisonment could be the equivalent of a death sentence for Mr. Long." *Id.* at 1278. We simply do not believe that Russell's deafness gives rise to the same extraordinary situation present in *Long*.

## VII.

For the reasons stated herein, we **VACATE** Russell's sentence and **REMAND** for re-sentencing in accordance with this opinion. In all other respects, we **AFFIRM** the district court's denial of relief from Russell's sentence.

ALAN E. NORRIS, Circuit Judge, dissenting.

The majority acknowledges that the district court has "wide latitude in considering facts at the sentencing stage" and that factual determinations, such as the one that now confronts us, are subject to reversal by this court only when we are "left with the definite and firm conviction that a mistake has been made." After careful review of the record before us, I have no such firm conviction and therefore respectfully dissent from that portion of the majority's opinion dealing with the number of marijuana plants attributed to defendant.

The majority frames the issue before us in these terms: "[W]hen the information contained in the return of a search warrant conflicts with information contained in an incident report, which should prevail?" My answer to this question would be simply, It depends upon the circumstances. Certainly if the two documents are equally detailed and have been compiled contemporaneously, the return would take precedence because, as the majority points out, it is a sworn document filed with a judicial official. However, as the district court observed, in this case the incident report contained considerably more detail and indicia of reliability than the return:

There are 31 lines indicating various items typed on this quote "Return and tabulation to consent search." There is however, in the multi-page investigation report some 56 different items noted as being seized, far more than are listed in the return and tabulation. I would conclude that the return and tabulation that the defendant is relying upon here is a summary and not an accurate one at that.

The accurate report appears to me to be ... the lengthy and detailed investigation report ... and it clearly and consistently indicates 96 plants from the room area of that bedroom, 8 plants from the closet area of that bedroom, they're called plants, they're not called anything else.

. . . .

There's a lot here that was seized that's not specifically delineated on this return and tabulation, so I think that there were 104 plants....

Under the Sentencing Guidelines, a calculation of the amount of drugs at issue for sentencing purposes involves a fact-based, case-by-case inquiry, which is precisely the kind of determination which our cases have consistently held to be the province of the district court. In this case, the district court engaged in just such an exercise, weighing the relative reliability of the evidence before it and finding that 104 marijuana plants were discovered at Russell's residence. Given the care taken by the district court, and in light of the majority's concession that "there [is] no evidence whatsoever of any bad faith on the part of the law enforcement officers regarding the discrepancy between the two tallies," I cannot conclude that the factual finding as to the number of marijuana plants was erroneous, let alone clearly so.

In all other respects, I agree with the majority.