**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Loyd BROOKS, Defendant–
Appellant.**

No. 00–6081.

United States Court of Appeals,
Sixth Circuit.

May 17, 2002.

Before MARTIN, Chief Judge, BOGGS, and DAUGHTREY, Circuit Judges.

PER CURIAM.

The defendant, Charles Loyd ("Bobo") Brooks, was convicted of conspiracy to manufacture methamphetamine and was sentenced to 30 years in prison. On appeal, he challenges (1) the district court's decision not to disqualify the Assistant United States Attorney who handled his case at trial; (2) the court's rulings on his motions to suppress and on various challenges to the admissibility of evidence at trial; and (3) the validity of his sentence. Although we find no reversible error in connection with the district court's decisions before and at trial, we conclude that the United States Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), released a short time after the sentencing hearing in this case, requires a remand for resentencing.

## *PROCEDURAL AND FACTUAL BACKGROUND*

This case began with the execution of a valid search warrant at the home of Ronnie Moore in Ringgold, Georgia, where the federal agents found methamphetamine cooking in a lab on the second floor of Moore's garage. Moore admitted to manufacturing methamphetamine and identified a man named "Bo," later identified as the defendant, as his source for red phosphorus, a precursor chemical used in the manufacturing process. Moore made a recorded phone call to defendant Brooks, during which he ordered two ounces of red phosphorus and arranged to meet Brooks that afternoon at a local restaurant.

When Brooks arrived at the restaurant, sheriff's deputies arrested and handcuffed him. A few minutes later, Detective Sergeant Tommy Farmer and Drug Enforcement Administration Special Agents David Shelton and David Gray arrived and began talking with Brooks in the parking lot of the restaurant. The officers were dressed in street clothes and were armed, although their weapons were neither drawn nor "overtly visible." Shelton advised Brooks that he was charged with conspiracy to manufacture methamphetamine. Brooks denied any involvement in a conspiracy to manufacture methamphetamine but told the officers that he had red phosphorus in his car and that, according to his research, it was not illegal to possess red phosphorus. In fact, other agents had found the two ounces of red phosphorus in Brooks's car, which was in the parking lot. Shelton informed Brooks that he did not have to say anything and began to give him his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Brooks interrupted Shelton and told him that he already knew his rights because he had spent time in federal prison.

After some discussion, Brooks told the agents that they were welcome to search his home in Tennessee because he was on parole and he would not keep "anything illegal" in his home. According to the officers, the tenor of the conversation in the parking lot was "low-key," and Brooks appeared friendly, relaxed, intelligent, and knowledgeable about his rights.

Shelton described Brooks's home as a converted garage that was small enough that one could see all of the other rooms from almost any place in the house and that the officers searched the entire three-room house in any place where they thought red phosphorous could be stored. (According to Shelton, red phosphorous is a powdery substance like paprika that is most commonly stored in bags or bottles or jars but that can be kept in envelopes or coffee filters or between paper towels or pieces of paper—essentially "in anything that you could put paprika or chili powder

in.") Although he testified that he was "primarily" looking for red phosphorous or drugs, he did concede that he was also looking for "anything of an incriminating nature."

As Brooks predicted, the agents did not find any red phosphorous in the house; however, they did find several other pieces of incriminating evidence that would later be admitted into evidence at Brooks's trial, including several money order receipts, blank order forms, and miscellaneous pieces of paper with the name and phone number of a company called Pyrotek, all of which was found in the drawer of a night stand. Shelton testified that "almost immediately" after he opened the drawer, "something with Pyrotek ... stuck out" and that he instantaneously recognized the name "Pyrotek," which he knew from previous investigations was a distributor of red phosphorous.

Among the papers in the drawer of the night stand, Shelton also found a Wal-Mart receipt for 8–10 bottles of HEET antifreeze, which he identified as a solvent commonly used in the production of methamphetamine. Shelton testified that although the Wal-Mart receipt was small, he immediately noticed the HEET because it was printed seven to eight times in a row on the receipt.

On an end table next to the couch in the front room, Shelton found an address book that contained several potentially incriminating markings: a note on one page stated "150 grams of phed, 50 grams of red, 300 iodine," a note on another page stated "ephederine, Smart, pH control in pools, muriatic acid, 31.45 percent HCI" and a third note stated "1 P, 1 1/2E, and 21,"

which the government interpreted as ingredients and ratios for the manufacture of methamphetamine. The address book also contained various notes which seemed to indicate people to whom Brooks owed money, or who owed Brooks money.

Finally, another officer looking for red phosphorus opened a small box that he found in an end table by the couch in the front room and discovered a "partial recipe for manufacturing methamphetamine."

A federal grand jury indicted Brooks for conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1), but did not specify the amount of drugs involved. Before trial, Brooks moved to suppress the evidence seized from his home on the grounds that his consent was not voluntarily given and that the search conducted exceeded the scope of his consent. With respect to the second issue, Brooks testified at a suppression hearing that he thought that the agents were going to search his house only for red phosphorous and that he consented only to a search for red phosphorous. Brooks testified that when he saw the agents seize evidence that was not red phosphorous, he protested.[1] However, according to one of the agents who was involved in the search, Brooks did not say anything to indicate that he was withdrawing his consent or limiting the scope of the consent when he saw the agents seize evidence that was not red phosphorous, and the district court credited the agent's testimony over that of Brooks and ruled that the scope of the search was not excessive.

After evidentiary hearings, the district court found, based on its analysis of the

---

1. When asked whether he asked the officers to stop searching once he realized that they were seizing papers and other materials that were not red phosphorous, Brooks testified:

When [the officer] started looking at the drawer, I said there is no phosphorous in

there. He didn't say anything. He kept on. He didn't answer me....

I didn't say stop, no but I told him there was no phosphorous there. I never thought they were looking for that, once they didn't find phosphorous, we were out of there....

factors set forth in *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir.1998), that Brooks's consent to the search of his home was voluntary. The district court also rejected Brooks's challenge to the search as outside the scope of his consent, finding that "Brooks' denial of having any illegal matter in the house, combined with his offer to permit the officers to search his house, would lead a reasonable person to conclude that Brooks was consenting to the search of his house for any illegal material." The district court further held that even if Brooks consented to a search only for red phosphorous, "all of the evidence relating to methamphetamine" was admissible under the plain view doctrine.

At trial, the prosecution offered the items found in Brooks's home to demonstrate Brooks's involvement in the conspiracy by showing that Brooks knew that the red phosphorous he was selling was used to manufacture methamphetamine. The prosecution also offered the testimony of law enforcement agents, co-conspirators, and witnesses, in addition to documentary evidence other than that seized from Brooks's home. Detective Farmer testified that agents found two ounces of red phosphorous in Brooks's car in the parking lot of the restaurant where Brooks was to deliver the red phosphorous to Moore. The prosecution offered into evidence Pyrotek shipping documents indicating that Brooks had ordered at least 56 pounds of red phosphorous from Pyrotek.

Moore, who had pleaded guilty to the conspiracy charge, testified that he first started cooking methamphetamine with Bill Hall, Brooks's nephew. Hall told Moore that Hall had gotten red phosphorous from Brooks. After Moore and Hall had a falling out, Moore started getting red phosphorous from Brooks. Moore testified that he got red phosphorous from Brooks on four to five occasions during the summer of 1999 for a total of seven ounces.

From these seven ounces, Moore made by himself 43 grams of methamphetamine. Moore also testified that Brooks asked him about a method of making methamphetamine and that Moore showed Brooks some finished methamphetamine on at least one occasion.

Eric Magin, who also pleaded guilty to the conspiracy, testified that he began cooking methamphetamine with Brooks's nephew, Hall. After Magin and Hall had a falling out, Magin started buying red phosphorous directly from Brooks. Magin said that he purchased a total of about five to six ounces of red phosphorous from Brooks, from which he usually got a 50% yield of methamphetamine. On the day that Brooks was arrested, Magin picked up some red phosphorus from Brooks and saw Brooks with about a pound of red phosphorus. Magin also testified that he had gotten HEET and iodine from Brooks and that Brooks told Magin how much iodine to use to manufacture methamphetamine. Finally, Jerome Jacob Ware, who was in the Hamilton County Jail with Brooks, testified that Brooks told him that he sold phosphorous to people in a "meth house" that was searched.

At the conclusion of the trial, the jury found Brooks guilty of conspiracy to manufacture methamphetamine. The jury was not asked to, and did not make, a finding as to the amount of methamphetamine attributable to the defendant. Brooks's presentence report concluded that Brooks had received 60 pounds of red phosphorous from Pyrotek. Because the prosecution produced testimony that the yield rate of red phosphorus to methamphetamine was 50%, the presentence report found that Brooks was responsible for 30 pounds, or 13.608 kg of methamphetamine. In a motion objecting to the presentence investigation report and at the sentencing hearing, Brooks specifically objected to the amount

of methamphetamine attributed to him. The district court overruled these objections, finding the presentence report "accurate," and sentenced Brooks to 360 months in prison based on Brooks's criminal history and 21 U.S.C. § 841(b)(1)(A), which provides for ten years to life imprisonment for the manufacture of 50 grams or more of methamphetamine.

## DISCUSSION

### 1. Participation by the Assistant U.S. Attorney

■ The defendant contends that the district court abused its discretion in failing to disqualify Assistant United States Attorney Perry Piper from participating in Brooks's trial because Piper worked as a federal public defender in 1993 when that office represented Brooks in a counterfeiting case. Piper actually raised the issue himself, just prior to the commencement of trial, stating that he did not know anything about Brooks's earlier case, that he would not cross-examine Brooks, and that he would not give any confidential information to anyone who might cross-examine Brooks. Given these assurances, the district court found that it was unlikely that any confidential information from Brooks's earlier case would be disclosed and that if it was, a hearing on the issue would be held at that point. No formal motion to disqualify was thereafter entered on the defendant's behalf, and his objection on appeal is limited to one that questions "the appearance of impropriety" of Piper's participation in the trial. In the absence of any allegation of prejudice, we decline to reverse on this basis.

### 2. The Suppression Rulings

The defendant argues that the evidence found in his home should have been suppressed because he did not voluntarily consent to the search of his home. The voluntariness of a defendant's consent to search is an issue of fact reviewed on appeal for clear error. *See United States v. Worley*, 193 F.3d 380, 384 (6th Cir.1999). After careful review of the record and the controlling precedents, we conclude that the district court did not clearly err in finding that the defendant's consent was voluntary. Nor do we find any error in connection with the ruling on the defendant's second argument—that if his consent was voluntary, the search exceeded the scope of that consent.

■ We need not resolve these issues, however, because an erroneous failure to suppress this evidence would, at most, constitute harmless error in light of the overwhelming remaining evidence of Brooks's guilt. *See, e.g., United States v. Baro*, 15 F.3d 563, 568 (6th Cir.1994) (finding district court's error in admitting evidence seized in violation of the Fourth Amendment harmless given the extensive testimonial evidence supporting the defendant's conviction). For example, the documents found in Brooks's home that were offered to demonstrate that Brooks ordered red phosphorous from Pyrotek are "purely cumulative" in light of the evidence from Pyrotek's and UPS's own files indicating that Brooks received several large shipments of red phosphorous. *See Bradley v. Cowan*, 561 F.2d 1213, 1217 (6th Cir.1977) (finding harmless error where the evidence seized in an unconstitutional search of the defendant's hotel room was "purely cumulative" of the other evidence of the defendant's guilt). Moreover, the seized Pyrotek materials add nothing to the testimony regarding the amount of red phosphorous found in Brooks's car or the testimony from Brooks's co-defendants regarding how much red phosphorous he supplied them. Although the formulas and ratios written on Brooks's address book suggest that Brooks understood that the red phospho-

rous he sold would be used for methamphetamine rather than for some innocuous purpose, this evidence is duplicative in light of the partial methamphetamine recipe properly admitted into evidence and the testimony of Brooks's co-conspirators regarding Brooks's understanding of the methamphetamine manufacturing process.

### 3. The Rulings on the Admissibility of Evidence at Trial

The defendant takes issue with several of the district court's rulings at trial. He argues, for example, that introduction of the evidence seized from his home violated the "other crimes" prohibition in Federal Rules of Evidence 403 and 404(b). We conclude that any error in this regard is unquestionably harmless, given the overwhelming proof of the defendant's guilt.

Nor do we find any reversible error in connection with the court's decision to allow the defendant's address book to go to the jury belatedly, some two hours after the jury had begun its deliberations. Through some oversight, this exhibit had not been passed to the jury at the time it was put into evidence. Again, we think any error was harmless, given the other evidence in the record.

Finally, the defendant argues that the district court erred in admitting the hearsay testimony of Moore, who testified that Hall told him that Hall and his uncle, defendant Brooks, had gone to Knoxville to cook some methamphetamine. This statement was admitted under the co-conspirator exception, under Fed.R.Evid. 801(d)(2)(E). As such, the judge's decision is reviewed for abuse of discretion. *See Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716–17 (6th Cir.1999). As we have noted in *United States v. Monus*:

> Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party

during the course and in furtherance of the conspiracy. Before a district court may admit statements of a co-conspirator, three factors must be established: (1) that the conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the co-conspirator's statements were made in furtherance of the conspiracy.

128 F.3d 376, 392 (6th Cir.1997). On appeal, Brooks argues that the government failed to meet its burden of proof with respect to the third factor. However, "[s]tatements that 'identify participants and their roles in the conspiracy' [ ] qualify as statements made in furtherance of the conspiracy." *Id.* at 393. Likewise, the "in furtherance" requirement is met "when statements are 'made to keep a conspirator abreast of a co-conspirator's activities....'" *See United States v. Rios*, 842 F.2d 868, 874 (6th Cir.1988) (internal citation omitted). Because Hall's comment to Moore could be interpreted as intended to identify Brooks's role in the conspiracy or to keep Moore abreast of the activities of Brooks and Hall, the district court's decision to admit this testimony does not constitute clear error.

### 4. The Validity of Brooks's Sentence after Apprendi

The defendant contends that he should be resentenced in light of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which was decided a few days after he was sentenced. The government concedes that an *Apprendi* violation occurred but contends that this error did not affect the outcome of the case and is therefore harmless. Because we cannot be certain from the evidence offered at trial that the jury would have found Brooks responsible for the amount of methamphetamine for which he was sentenced, we conclude that the *Apprendi*

error prejudiced Brooks and that he is entitled to be re-sentenced.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The jury found Brooks guilty of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1) but was not asked to determine the amount of drugs for which Brooks was responsible. Instead, the district court sentenced Brooks to 30 years' imprisonment under 21 U.S.C. § 841(b)(1)(A), based on a determination in the presentence report that Brooks was responsible for 13.608 kg of methamphetamine. In doing so, the district judge ran afoul of the new ruling in the Supreme Court's not-yet-released *Apprendi* opinion. But because the court's sentencing order pre-dated *Apprendi's* release date, that order is reviewable for plain error only, under the test set out in *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

As noted above, Brooks was sentenced under 21 U.S.C. § 841(b)(1)(A), which is applicable when the amount of methamphetamine involved in the offense is more than 50 grams but less than 500. The district court ascribed to the defendant the full amount calculated in the presentence report—13.608 *kilograms,* an amount that substantially exceeds the 500 gram limit of subsection (A). The defendant argues that because no amount of methamphetamine was alleged in the indictment, and none was specified in the jury verdict, he is subject to sentencing only under § 841(b)(1)(C), which provides for a maximum of 20 years imprisonment for the manufacture of an unspecified amount of methamphetamine. On the other hand, the government, while conceding error un-

der *Apprendi*, contends that the record is sufficiently clear on the question of the quantity of methamphetamine attributable to Brooks that we can affirm the district court's sentencing order under the rubric of *United States v. King*, 272 F.3d 366 (6th Cir.2001). Because the evidence, as summarized below, appears to support the manufacture of 43 grams of methamphetamine from red phosphorus secured directly from Brooks, it is possible that under *King*, the defendant is properly subject to sentencing under § 841(b)(1)(B), which applies to amounts greater than five grams but less than 50, and results in a sentence of 5–40 years.

In *King*, we held that the *Apprendi* error in the defendants' sentencing did not affect their "substantial rights," because the undisputed testimony of a forensic chemist provided that one of the packages at issue contained 82 grams of methamphetamine and because both defendants failed to object to the drug-quantity calculations in their presentence reports. *See King*, 272 F.3d at 379–80. Likewise, we held in *United States v. Stafford*, 258 F.3d 465, 478 (6th Cir.2001), utilizing plain error review, that the *Apprendi* error did not affect the defendant's substantial rights because he had "effectively admitted" the types and quantities of cocaine involved in the offense.

In this case, however, there is an additional gloss on the possible application of *King* and *Stafford.* When "a person who participates in a drug conspiracy does not necessarily agree to a specific amount in advance, no defendant may be held responsible for acts beyond the scope of his or her participation in the conspiracy." *United States v. Pruitt*, 156 F.3d 638, 644 (6th Cir.1998). Moreover, in cases in which a defendant is convicted of a drug offense based on the sale of precursor chemicals, the government bears the burden of prov-

ing the amount of illegal *drugs* attributable to the defendant. *See United States v. Mahaffey,* 53 F.3d 128, 131–33 (6th Cir. 1995). The prosecution must do this with specific proof of the yield rate and capabilities of the lab in question; it is not enough to base this determination on the amount of the precursor chemical and a generalized yield rate. *See id.* at 132–33 (reversing district court's finding that 900 grams of methcathinone were attributable to the defendant where the government failed to provide specific evidence regarding the methods and success rates of the labs in question); *see also United States v. Hamilton,* 81 F.3d 652, 654 (6th Cir.1996) (the district court must "tailor its findings to the particular situation of individual defendants' abilities to covert raw materials into drugs").

Moore testified at trial that he cooked a total of 43 grams of methamphetamine from the red phosphorous he bought from Brooks. The government asserts that this figure does not include the methamphetamine that Moore made with Hall, but the record before us does not indicate how much methamphetamine Hall and Moore cooked together from Brooks's red phosphorous. Magin testified that he got a total of 5 to 6 ounces of red phosphorous from Brooks and that he never managed to achieve better than a 50% yield. This means that Magin manufactured at most 70.75 to 84.9 grams of methamphetamine from the red phosphorous Brooks supplied. Wallace Donnie Evans testified that he secured a pound of red phosphorous from Hale at Brooks's house, but the record on appeal does not indicate whether Evans ever used this red phosphorous or how much methamphetamine it yielded. Finally, according to Brooks's pre-sentence report, the evidence at trial showed that Brooks received 60 pounds of red phosphorous from Pyrotek during the course of the conspiracy. The pre-sentence report used this evidence to find Brooks responsible for the manufacture of 13.608 *kilograms* of methamphetamine based on a yield rate of 50 percent. Again, however, the record on appeal does not indicate how much of this red phosphorous Brooks actually sold before he was arrested. Moreover, the government's method of determining the amount of methamphetamine produced from the red phosphorous does not pass muster under *Mahaffey. See id.* at 132–33.

Although it is *possible* that the jury would have found Brooks responsible for the manufacture of more than 50 grams of methamphetamine based on this evidence, the record leaves ample room for reasonable doubt. Given the weakness of the government's proof of the amount of methamphetamine directly attributable to Brooks, we simply cannot find that the *Apprendi* error in this case did not affect Brooks's substantial rights.

### CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court insofar as it relates to Brooks's conviction but REMAND the case to the district court for resentencing in light of *Apprendi.*