**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Danilo BARO (92–1501; 93–1250) and**
**Ramon Baro (92–1502; 93–1250),**
**Defendants–Appellants.**

Nos. 92–1501, 92–1502 and 93–1250.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 4, 1993.

Decided Feb. 2, 1994.

Rehearing Denied in Nos. 92–1502,
93–1250, March 21, 1994.

Barbara Colby Tanase (argued and briefed), Office of the U.S. Atty., Detroit, MI, for the U.S., plaintiff-appellee.

Joaquin Perez (argued and briefed), Charles White Assoc., Miami, FL, for Danilo Baro, defendant-appellant.

Charles G. White (argued and briefed), Charles White Assoc., Miami, FL, for Ramon V. Baro, defendant-appellant.

Before: MARTIN and BOGGS, Circuit Judges; and HULL, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Danilo Baro and Ramon Baro were convicted by a jury of unlawful distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846. Danilo Baro was also convicted of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848. They now appeal, on numerous grounds, their convictions and the sentences imposed by the district court. For the following reasons, we uphold Danilo Baro's and Ramon Baro's convictions, but vacate their sentences. We remand so that the district court may make further findings regarding the proper quantity of cocaine to be attributed to each defendant.

## I

Danilo Baro, Ramon Baro, and five other defendants were charged with conspiracy to possess with intent to distribute cocaine and distribution of cocaine. The indictment alleged that Danilo Baro, with the assistance of his brother, Ramon, ran a cocaine distribution operation out of Miami, Florida. Over an approximately two-year period beginning in June 1988, the Baros sold a substantial quantity of cocaine to various Detroit-based associates, including Rolando Arango, Victor Suarez, and Alberto Dupont.

On occasion, Ramon Baro served as a courier for his brother, transporting cocaine to Detroit and subsequently returning to Miami with the cash proceeds from the sale. On August 26, 1988, drug interdiction task force agents observed Ramon Baro and a companion enter the Northwest Airlines terminal at Detroit Metropolitan Airport. Minutes later, Baro approached Charles Moffitt, unaware that Moffitt was an undercover special agent

* The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennes- see, sitting by designation.

with the Drug Enforcement Agency. Baro indicated that he was traveling to Miami with a companion, and asked where he could purchase a one-way ticket with cash. After offering direction, Moffitt watched Baro purchase a ticket at the appropriate counter, separate from his companion, and walk toward the departure gate.

After Baro passed through the security gate into concourse E, Moffitt overtook Baro, introduced himself as a police officer, and asked to speak with Baro. Baro agreed. At this point, approximately ten minutes remained before Baro's flight to Miami departed.

Asking for Baro's ticket and identification, Moffitt first confirmed that the name on the ticket matched that on the driver's license. Moffitt then asked for permission to search Baro's person and carry-on bag. After securing Baro's consent, Moffitt found and removed two bundles of currency from the bag and a third bundle of currency from Baro's waistband. Baro claimed that he was carrying the money, which he stated was derived from the remortgage of his house, because he had intended to purchase an automobile in Detroit.

Holding the three bundles in his hand, Moffitt informed Baro that he was taking the money to the DEA's airport office to subject it to a canine sniff. Moffitt then presented Baro with two options: catch the flight to Miami and wait for a receipt for the money to arrive in the mail or accompany the agent to the DEA office. Although informed that he was not under arrest, with less than five minutes remaining in which to catch his flight, Baro chose to stay with his property.

At the DEA office, the dog reacted positively for drugs. In response to further questioning regarding the source of the funds, Baro again told Moffitt that he obtained the money from the remortgage of his home and added that a portion of the cash was derived from the recent sale of Casino Dry Cleaners, a business that Baro had owned in Miami. The agent's call to directory assistance in Miami revealed no listing for the business. After being photographed, Baro was allowed to leave the DEA office

with his bag. Moffitt retained the currency, which totaled $14,190.00.

Ramon Baro's August 1988 contact with the DEA agents at Detroit Metropolitan Airport ended his stint as a courier for his brother. The Baro cocaine distribution operation, however, continued unabated for more than a year. To establish the total amount of cocaine distributed by the Baros during the conspiracy, the government relied upon testimony from three sources: Rolando Arango, Elaine Dunkcan, and Alberto Dupont.

First, Arango testified at trial that he received a total of about forty-two kilograms of cocaine from the Baros on ten separate occasions. In particular, Arango testified that he arranged through Danilo Baro to obtain one kilogram of cocaine in July 1988. Later that summer, Ramon Baro twice delivered two kilograms of cocaine to Arango in Detroit. During the remainder of 1988, Arango received from Danilo Baro, via unidentified couriers, four shipments totaling about twenty-eight kilograms of cocaine. Finally, in early 1989, Arango traveled to Miami with Suarez on three occasions, purchasing a total of seven kilograms of cocaine from Danilo Baro and receiving two additional kilograms of cocaine to hold for Ramon Baro.

Elaine Dunkcan, Suarez's girlfriend during 1988 and 1989, testified at trial that she was aware that Suarez received between two and five kilograms of cocaine from the Baros. First, Dunkcan accompanied Suarez and Dupont to Miami in 1989 and observed the men receive two or three kilograms of cocaine from the Baros. Dunkcan also recounted that soon after she and Suarez returned to Detroit from a trip to Miami in January, 1990, they were arrested as they attempted to deliver the second of two kilograms of cocaine to a confidential informant. Dunkcan was unable to confirm, however, that either Danilo or Ramon Baro was the source of these two kilograms.

Finally, the government credits the Baros as the source of two kilograms of cocaine recovered by the police from a car parked at Dupont's house. The car was registered to Ramon Baro. According to police testimony at trial, Dupont stated after his arrest that

he had transported the cocaine to Detroit for Suarez.

Following a three-week trial, the jury found both Danilo and Ramon Baro guilty of conspiring to distribute cocaine as well as distribution of cocaine. Danilo Baro was also convicted of engaging in a continuing criminal enterprise. At sentencing, the government argued, and the district court agreed, that the conspiracy involved at least fifty kilograms of cocaine—forty-two kilograms obtained by Arango, five kilograms identified by Dunkcan, two kilograms recovered from Dupont, and at least one additional kilogram based on evidence that Suarez and Dupont made regular trips to Miami during this period. Over the objection of both defendants, the court included in its calculations under the Sentencing Guidelines a total of at least fifty kilograms of cocaine and assigned both defendants a base offense level of thirty-six. The court also found that both defendants played managerial or supervisory roles and thus added two additional levels to Ramon Baro's base offense level and four additional levels to Danilo Baro's base offense level. Danilo Baro was sentenced to a term of incarceration of 320 months, to be followed by a five-year term of supervised release, and a fine of $5,000. Ramon Baro was sentenced to 260 months of incarceration, a five-year term of supervised release, and a fine of $5,000. This timely appeal followed.

Challenging both their convictions and their sentences, Danilo and Ramon Baro raise numerous grounds for relief. Ramon Baro asserts that he has standing to join Dupont's motion to suppress evidence seized from Dupont's car on January 25, 1990. In addition, both defendants claim that the district court abused its discretion in selecting the method of exercising peremptory challenges. The Baros also claim that they were denied due process of law and their right to confront Arango. Finally, Ramon Baro argues that he was a minor participant in the conspiracy and the district court thus erred by including a two-level increase pursuant to U.S.S.G. § 3B1.1(c) in the calculation of his sentence. Having considered these issues and finding them without merit, we turn to the two claims that do warrant consideration:

the district court's denial of Ramon Baro's motion to suppress evidence obtained during the August 1988 airport encounter, and the district court's calculation of the base offense level for Ramon and Danilo Baro.

## II

■ Raising two separate grounds, Ramon Baro contests the district court's denial of his motion to suppress evidence and statements obtained during the August 1988 encounter with Agent Moffitt at the Detroit Metropolitan Airport. While this Court reviews the district court's factual findings on suppression issues for clear error, we analyze the district court's conclusions of law under a *de novo* standard. *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992).

■ Ramon Baro first claims that the district court erred in finding that he consented to the search of his carry-on bag and person. As the numerous airport search cases recently before this Court make clear, the Fourth Amendment is not violated when a police officer approaches a member of the traveling public, identifies himself as a law enforcement officer, and solicits information. *United States v. Taylor,* 956 F.2d 572, 575 (6th Cir.) (en banc) (citing cases), *cert. denied,* — U.S. ——, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992). Moreover, a request to search the passenger's luggage or person does not transform this initial questioning into a seizure. *United States v. Flowers,* 909 F.2d 145, 147 (6th Cir.1990). Against this backdrop, a court then confronts the question of whether the approached and questioned passenger actually consented to a search of his bag or person. Where, as here, the government alleges that consent was voluntarily given, "the government bears the burden of proof on this issue" and "the consent must be unequivocal and intelligently given, untainted by duress or coercion." *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir. 1990).

In this case, the district court determined that Ramon Baro consented to Moffitt's search of his carry-on bag and person. Despite Baro's assertions to the contrary, we do

not find this conclusion to be clearly erroneous. A review of the record convinces us that the district court correctly found that Baro gave uncoerced consent to the search within the context of a consensual conversation with Moffitt. *See Taylor,* 956 F.2d at 578.

Second, Ramon Baro challenges the district court's ruling that he consented to accompany Agent Moffitt to the DEA office for the canine examination of his currency. Noting that Moffitt held more than $14,000 of his money and that his flight for Miami was scheduled for imminent departure, Baro claims that both his cash and his person were seized without probable cause in violation of the Fourth Amendment. We agree.

Moffitt's assertion of control over the cash that he took from Baro constituted a seizure of the property. A property seizure for Fourth Amendment purposes occurs when a governmental intrusion "meaningfully interferes" with an individual's possessory interests in the property. *Arizona v. Hicks,* 480 U.S. 321, 324–25, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987). Here, after removing the currency from Baro's carry-on bag and person, Moffitt held the money in his hand. The agent then informed Baro that he was taking the money to the DEA office to be tested with a narcotics detection dog. At this point, Moffitt meaningfully interfered with Baro's possessory interests in the cash and a seizure occurred. *United States v. $53,082.00 in United States Currency,* 985 F.2d 245, 248 (6th Cir.1993).

Despite the government's assertions to the contrary, Baro did not consent to this seizure. At the suppression hearing in this matter, Agent Moffitt testified, "[t]he first thing I said to him [Baro] is that I'm going to take this currency and take it to the DEA office approximately five minutes away, have a canine examine it." Joint Appendix at 417. Such a matter-of-fact declaration leaves no room for Baro's consent to the seizure of his money. As this Court emphasized in *$53,082.00,* "telling [a traveler] the money would be tested by a narcotics dog was a conclusive statement, not a request; therefore, consent could not be given." *$53,082.00,* 985 F.2d at 248.[1]

 Absent valid consent, the government must establish that this warrantless seizure was justified by probable cause. *See United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). Recognizing that a greater expectation of privacy exists in property carried on one's person, this Court has stressed that "[p]robable cause is required to justify the seizure of such items." *$53,082.00,* 985 F.2d at 249. In this context, probable cause means a reasonable ground for belief that the item seized is contraband or evidence of a crime. *See Place,* 462 U.S. at 701, 103 S.Ct. at 2641; *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

 On the facts of this case, the government is unable to carry its burden. At the time Agent Moffitt seized Baro's currency, he knew the following facts: Baro was traveling to Miami; he arrived shortly before his flight and purchased a one-way ticket in his name with cash; although observed entering the terminal with a companion, Baro attempted to present the appearance that he was traveling alone; Baro constantly looked

---

1. Given the particular facts of this case, the seizure of Baro's property under these circumstances was tantamount to a seizure of his person as well. As the Supreme Court has recognized, a seizure of personal property from a member of the travelling public "can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return." *United States v. Place,* 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Here, Moffitt presented Baro with a Hobson's choice: abandon more than $14,000 to a plain-clothed stranger without obtaining a receipt in return or miss his flight, forfeit his plane ticket, and remain stranded in foreign environs. In this situation, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Accordingly, we conclude that Baro was seized when, less than five minutes before his flight to Miami was scheduled to depart, Moffitt informed Baro that his money was being transported to the DEA office for a canine examination. As we hold that Moffitt lacked probable cause to seize Baro's currency, we need not address whether the agent's observations were sufficient to support an investigatory detention.

around as he walked through the airport; Moffitt's search revealed that Baro carried $14,190 in cash; and Baro gave an unlikely explanation for the source of the money. We review each of these observations in turn to determine whether, in the aggregate, the evidence establishes probable cause. *See United States v. Knox,* 839 F.2d 285, 290 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

■ While travel to an alleged drug source city, late arrival at the airport, and nervousness are inherently unsuspicious activities, this Court has held that these facts are probative in deciding whether the government has established probable cause. *United States v. $67,220.00 in United States Currency,* 957 F.2d 280, 285 (6th Cir.1992). A defendant's attempt to conceal the fact that he is traveling with another also indicates possible criminal activity. *Knox,* 839 F.2d at 290. Even when considered together, however, these factors alone did not provide Agent Moffitt with a reasonable ground for belief that the currency seized from Baro was contraband or evidence of a crime.

The remaining observations cited by the government are of questionable evidentiary value. The probative nature of the fact that Baro purchased his ticket with cash is countered by the fact that he purchased the ticket in his own name, thereby destroying the anonymity of the transaction and acting contrary to the characteristic behavior of drug couriers. Moreover, although we recognize that "evasive statements to police officers indicate possible criminal activity," Baro's statements prior to the seizure of his cash provide, at best, "inchoate and unparticularized suspicion." *$53,082.00,* 985 F.2d at 250 (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)) (unverifiable, alternating statements that seized cash was earned by working for the Detroit Board of Education, obtained from selling refurbished HUD houses, or won in the lotto insufficient, even when coupled with drug courier profile, to establish reasonable articulable suspicion). Finally, Agent Moffitt had no reason to believe that the currency was itself contraband. *See United States v.*

*$7,850.00 in United States Currency,* 7 F.3d 1355, 1358 (8th Cir.1993).

Accordingly, we conclude that the facts known to Moffitt at the time he seized the currency from Baro did not provide the officer with probable cause. The absence of contraband distinguishes this case from *Taylor,* where this Court, addressing many of the same factors highlighted by the government here, found that the officers had probable cause to arrest the suspect. As the *Taylor* court emphasized, the range of facts known about Taylor, "coupled with" the discovery that the suspect carried spherical, tape-bound packages characteristically used to transport cocaine provided the officers with probable cause to arrest the suspect. *Taylor,* 956 F.2d at 578. To date, this Court has not held that currency is contraband. Accordingly, based upon our review of the record, we are "left with a definite and firm conviction that a mistake has been committed" by the district court. *United States v. Tillman,* 963 F.2d 137, 143 (6th Cir.1992).

■ Despite the district court's error in admitting this evidence in violation of the Fourth Amendment, Ramon Baro's conviction must stand. Given the extensive testimony at trial supporting Baro's guilt on the counts of conviction, this Court finds that the district court's admission of the tainted evidence was harmless error. *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Accordingly, we affirm Ramon Baro's conviction.

### III

The district court determined that the Baros were responsible for the distribution of at least fifty kilograms of cocaine and, pursuant to section 2D1.1(c)(4) of the Sentencing Guidelines, set their base offense levels at thirty-six. Both defendants appeal this calculation, claiming that the government failed to present sufficient evidence to link them to an amount that totals fifty kilograms.

■ A district court's factual findings regarding the amount of cocaine for which a defendant is to be held accountable are accepted by this court unless clearly erroneous. *United States v. Walton,* 908 F.2d 1289,

1300–01 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). For sentencing purposes, calculation of the amount of drugs involved in a crime must be supported by a preponderance of the evidence. *United States v. Moreno,* 899 F.2d 465, 473 (6th Cir.1990). Where the amount is uncertain, the district court is encouraged to "err on the side of caution" and only hold the defendant responsible for that quantity of drugs for which "the defendant is more likely than not *actually* responsible." *Walton,* 908 F.2d at 1302. While a district court may consider amounts not specified in the indictment, "[t]he evidence of other quantities of drugs involved must have a minimal level of reliability beyond mere allegation." *United States v. West,* 948 F.2d 1042, 1045 (6th Cir.1991).

 At the sentencing hearing, counsel for the Baros noted that testimony linked the Baros, at best, to the distribution of forty-nine kilograms of cocaine. In response, the government alleged that testimony regarding travel by Suarez and Dupont to Miami, coupled with a pattern of kilogram-quantity sales of cocaine by the Baros, was sufficient to support an inference that the Baros distributed a least one additional kilogram of cocaine, thereby warranting a two-level increase in the base offense level under the Sentencing Guidelines. The district court, without making any factual findings to support the one-kilogram increase, sentenced Danilo and Ramon Baro according to the fifty-kilogram calculation.

In doing so, the district court failed to err on the side of caution. Especially where, as here, the district court's determination of the quantity of cocaine involved results in a two-level increase in the base offense level, the sentencing judge may not, without further findings, simply sentence a defendant based on conjecture. In reaching this conclusion, which increased the defendants' potential term of incarceration by at least forty-seven months, the district court failed to identify the evidence on which it relied to find both defendants responsible for the increased amount or to address testimony in the record that Dupont traveled to Miami during this period for legitimate reasons. Thus, we must remand. *Cf. United States v. Medina,* 992 F.2d 573, 589–91 (6th Cir.1993) (remanding cases where district court failed to make necessary factual findings regarding the total quantity of drugs for which each defendant responsible); *United States v. Jackson,* 990 F.2d 251, 254 (6th Cir.1993) (remanding case where district court failed to make necessary factual findings to support conversion of cash into drug quantities). Given the marked impact of this single kilogram increase on the defendants' sentences, the district court should explicitly set forth the evidence on which it relies if it finds either Danilo and Ramon Baro accountable for distribution of at least fifty kilograms of cocaine.

## IV

For the foregoing reasons, this court affirms Danilo Baro's and Ramon Baro's convictions. We remand both cases for resentencing.