**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**$30,000.00 IN UNITED STATES CUR-RENCY Seized from Atef Yousef Jaber; $4,460.00 in United States Currency Seized from Wiam A. Younes, Defendants,**

**Atef Yousef Jaber; Wiam A. Younes, Claimants–Appellants.**

**No. 00–5410, 00–5427.**

United States Court of Appeals, Sixth Circuit.

Feb. 22, 2002.

Before BOGGS and SUHRHEINRICH, Circuit Judges; and CLELAND,* District Judge.

PER CURIAM.

Atef Yousef Jaber ("Jaber") and Wiam A. Younes ("Younes") (collectively "Claimants") appeal civil forfeitures pursuant to 21 U.S.C. § 881(a)(6). Defendants are $30,000, belonging to Jaber, and $4,460, belonging to Younes. Claimants challenge the order denying their motion to suppress evidence, and the grant of summary judgment in favor of the Government. They also assert that delay in bringing the forfeiture proceedings was a denial of due

* Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

process. Claimants seek dismissal of the forfeiture actions and return of their currency, with interest, and their bonds. We REVERSE.

### I. Background

This case could be briefly summed up as an airport stop of two men who had a lot of cash and not the best explanation for carrying it. However, we set forth the facts in order to properly consider each of the men's claims separately.

*Pre–Contact Stage:* On January 20, 1998, DEA Task Force Officer Carl Parker (TFO Parker) received information about two men flying to Columbus, Ohio, from Los Angeles, California. They were traveling on round-trip tickets purchased with cash less than twenty-four hours prior to departure and with a return flight in eleven hours. Delta Airline ("Delta") records show they had not checked luggage and traveled under the names of "Sam Jaber" and "William Younes." TFO Parker and two other officers assigned to the Cincinnati/Northern Kentucky International Airport obtained a list of passengers with connecting flights in Cincinnati. When the flight arrived, officers observed two men deplane and ask for the Columbus flight's gate.

*Interview Stage:* The officers approached the men, who had gone to a coffee shop in the airport, identified themselves as DEA Narcotics Officers, and showed their identification. When TFO Parker asked to see their tickets and asked whether they had checked bags, Jaber removed two tickets from his coat pocket and both men said they had not checked bags. The tickets were in the names of "Sam Jaber" and "William Younes." When Parker asked if "Sam Jaber" was his real name, Jaber said "no," and explained that his brother gave him the ticket at the last minute because he

had to go to a funeral. Parker then asked to see identification. Jaber produced a California driver's license in his own name, and Parker handed the license to his partner to run a criminal check. Parker asked Jaber if his trip was for business or pleasure, and Jaber said it was a business trip. When Parker asked if Jaber had drugs or drug proceeds, Jaber said he had no drugs. When Parker asked Jaber if he had any money, Jaber said he had $30,000 in cash and that it was his brother's money. When Parker told him that it was strange to carry that much cash, Jaber said his brother gave him the money to look for business opportunities in the Columbus area. When Parker asked if he knew anyone in Columbus, Jaber said he did not, but his uncle, who owned a bar in Cleveland, told him there were a lot of business opportunities in Columbus. When Parker asked Younes if he was carrying a large amount of money, Younes said he had $4,600 in cash.

When TFO Parker asked if the men would mind stepping into a Delta group room so he could count their cash, they assented. After Parker and the other officers walked with Claimants to the Delta room, Parker asked them if he could see their money. Jaber removed several packets of money from his business suit jacket, and one packet from his socks. Jaber's money was in bank wrappers. Younes removed the cash from his front pants' pocket and said it was his own money. Younes' money appeared to be new currency. When Parker asked about their work, Jaber said he was a self-employed linen salesman, and Younes said he worked at a casino and made $90,000 last year.

After the other TFO ran a Narcotics and Dangerous Drug Indexing System (NADDIS) criminal history check, he told

TFO Parker that Younes[1] was positive for methamphetamine and weapons, and that he had a drug arrest in California. Parker then asked Claimants whether they had ever been arrested, both said no. Parker then told Claimants he believed he had probable cause to seize their money because he thought it was drug proceeds.

*Post-seizure events:* After Parker told Claimants he was seizing their money, Parker asked if he could search them. Both assented. Parker found some money in Jaber's wallet, but it appeared to be less than $100, and Jaber said it was his own. Parker also found money in Younes' wallet, but it was not very much. Parker then gave the wallets, with the money found therein, back to the men.

Parker then told Claimants he was going to the airport police station to have the money counted, that they could come and watch, and that they would be given receipts. Claimants said they did not want to and said to just mail them a receipt. After Claimants were escorted out of the Delta room, both men thanked Parker, which Parker thought was strange because he had just detained their money.

*Subsequent investigation:* Investigation revealed the following, as paraphrased from the DEA Report of Investigation:

(1) When the currency was counted by a bank teller, two counterfeit $100 bills were found in Younes' exhibit, so this matter was referred to the Secret Service. Younes' currency thus totaled $4,460 without consideration of the counterfeit bills. Jaber's currency totaled $30,000.

(2) Los Angeles authorities verified Jaber's self-employment and indicated there was no drug-related intelligence on him. They verified that, although Younes had been arrested for attempting to sell counterfeit methamphetamine to an undercover agent, there had been no adjudication of his case. According to Parker's affidavit, the charge was dropped because Younes agreed to cooperate with authorities.

(3) An analyst at the El Paso Intelligence Center (EPIC) indicated Jaber was identified in NADDIS under the name of "Abu–Jaber" in a report regarding seizure of $34,460, dated February 11, 1998, and that Jaber had listed the same address as a subject who had been interdicted at the Dallas–Fort Worth International Airport in May 1997, when $116,000 was seized. The address was not stated. The analyst also indicated "Jaber" submitted a false Social Security number and false date of birth of March 3, 1960. It is unclear whether the information about "Jaber" pertains to Claimant Jaber, or the Dallas subject.[2]

(4) Authorities in Columbus did not have intelligence information on the Claimants. However, Columbus authorities indicated the city had recently become a source of supply for pseudoephedrine, a chemical precursor for methamphetamine, and a number of subjects of middle-eastern descent had been traveling to Columbus to obtain pseudoephedrine to make methamphetamine.

(5) Younes' employer, the Bicycle Club Casino, verified he was employed from January 23, 1993, through December 28,

1. The affidavit reflects the corrected version of the report that it was Younes who was NADDIS-positive, but the report initially stated that Jaber was NADDIS-positive.

2. It is apparent that the NADDIS reference to Jaber refers to the instant case, as it deals with $34,460.00 seized shortly after the stop of Claimants in late January 1998. The Government cannot pull itself up by its bootstraps in this manner. In addition, we take notice that the Government conceded at oral argument that Claimant Jaber was not the man interdicted at the Dallas–Fort Worth Airport.

1997, as a poker dealer earning minimum wage. Although Younes' income was not disclosed, the human resources manager indicated Younes was not capable of earning $90,000.

(6) A technician at the National White Collar Crime Center (NWCCC) indicated there was no record for Jaber, and no records existed for the social security number provided by Younes. A search by the surname "Younes" revealed one address, 1475 S. Bedford Street. A search by that surname and the date of birth provided by Younes revealed one record for the address 280 Del Mar, #109, Pasadena, California. These addresses were not linked further to anyone else suspected of drug trafficking. Moreover, Younes' address is 2130 West Cresent Avenue, Anaheim, which does not match NWCCC records. NWCCC reported Younes owned no property, had not filed bankruptcy, and had no liens or judgments against him.

(7) An analyst at the Bureau of Criminal Identification and Investigation (BCII) indicated Jaber had three California addresses, including 1322 East Fairgrove Avenue, West Covina; 1244 Falstone Avenue, Hacienda Heights; and 14723 Borego Drive, La Mirade. BCII indicated the telephone number listed for the Falstone address is subscribed to Rafat Jaber, and that the Borego address was also the address of Rafat Jaber and Sam Jabar, presumably brothers of Jaber. BCII further indicated that Sam Jaber had listed addresses that included 1244 Falstone Avenue, the same address as Claimant Jaber. BCII indicated Jaber had no liens, judgments, or bankruptcies, and did not own real estate.

(8) A NADDIS check for all known associates of Jaber indicated Jaber is NADDIS-positive (for what, specifically, is not indicated) and had four aliasas: Atef Abu Wassel Jaber, Atef Yousef Jaber, Atef Abu Jaber, and Sam Jaber.

(9) NADDIS history also listed an address for "Atef Jaber" of 1347 Heritage Court, Escondido, California, an address not listed for Jaber by BCII, and not matching Claimant Jaber's address. According to NADDIS, the Heritage Court address is also used by Ata Zalen Mohammed Dighlawi. During a one-year period, Dighlawi had been arrested on three separate occasions for possession of between 100 to 120 cases of pseudoephedrine. In June 1997, Dighlawi was interdicted at the Dallas–Fort Worth International Airport, when $116,764 was seized as drug trafficking proceeds. Further investigation revealed that Dighlawi had been identified in DEA investigations, one of which involved Body Dynamics, Inc. Pharmaceuticals, which is located in Indianapolis, Indiana, approximately one hour west of Columbus. Body Dynamics had been identified as a source of pseudoephedrine, ephedrine, and guaifenesin, all used in illegal manufacture of methamphetamine. In addition, Dighlawi has a criminal associate named Bob Younis Eliya, or Eliya Bob Younes. Eliya's vehicle was surveilled in a September 1997 methamphetamine trafficking investigation.

(10) According to the DEA report and Parker's affidavit, a TFO noticed that Jaber's wife's maiden name is Dighlawi. The source of this information is not disclosed.

(11) Also according to the DEA report, a TFO had verbal intelligence information from TFOs nationwide that drug trafficking organizations had been using people without criminal or drug histories to courier money and/or drugs from one area of the country to another. The report therefore concluded that Jaber is a classic example of this tactic because he had no criminal history but is related to and associated with methamphetamine traffickers,

and is used by them to courier currency and precursor chemicals. Pseudoephedrine, one such precursor, is a lawful, over-the-counter cold medicine (i.e., Sudafed).

*Claimants' evidence:* In sworn claims of ownership, both Jaber and Younes declared they were lawful owners of their respective currency, that it was unlawfully seized, and they had not violated any federal law or any laws of Ohio or Kentucky. Claimants also asserted there was no probable cause for the searches and seizures, and that the conduct was violative of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments, 42 U.S.C. § 1983 (racially motivated search based on Claimants' middle eastern descent; Claimants are Palestinians), and parallel state constitutional provisions and statutes.

Jaber submitted sworn answers to interrogatories in which he made the following responses: His name is Atef Yousef Jaber. He was born September 25, 1960. His address for more than ten years, which he leases and from which he operates his business, is 1244 Falstone Avenue, Hacienda Heights, California. His wife's name is Hamidia A.G. Jaber. He is self-employed selling linens. His income for the years 1995 to 1997 was $32,055, $33,550, and $34,501, respectively, and he received gifts from his family of about $10,000 each year, as is the custom of his culture. He submitted tax returns reflecting this income.

Jaber's interrogatory responses also indicated he only had three store credit cards, Sears, Mervyns, and Target. His monthly expenses were about $1,600. His savings consisted of $30,000, which reflected $7,000 each from two relatives, and $16,000 from earnings. He stated neither he nor his spouse had ever been convicted of any crime, and they had never been involved in court litigation. He also stated he had never purchased an illegal substance and never sold an illegal substance.

Jaber recited his version of the encounter on January 20, 1998, which was similar in many respects. He also explained that six months prior to the incident he tried to purchase a convenience store in California but could not afford the down payment. He gave specific details of the stores he tried to purchase. He further explained that he had an uncle who had purchased a store in Cleveland, Ohio, that through his uncle and other contacts he learned stores could be purchased at lower prices and lower down payments there and in Columbus, and that he was given a contact to "a Mr. Khuri (sic)" in Columbus. He did not give Khuri's name to the officers because he was afraid he was in trouble for something he did not understand and he did not want to involve Mr. Khuri. He stated that family members and Younes could support his allegations, but he did not submit affidavits from them. He also indicated he called four days after the incident to inquire about his receipt.

Jaber submitted his marriage license, showing his wife's maiden name is Jaber, her father's name is Nayef A.A. Jaber, and her mother's maiden name is Sakieh Manassrah. Jaber's driver's license shows his address is 1244 Falstone Avenue, which matches the address shown on all his tax returns. His Social Security card matches the social security number disclosed on all of his tax returns. His driver's license, resident alien card, and U.S. Reentry Permit, show his date of birth is September 25, 1960.

In Jaber's responses to the Government's request for admissions, he admitted that at the airport he did not know the name of business contacts in Columbus, admitted that he stated his uncle had contacts in Cleveland, and denied that he currently knew the name of business contacts. Jaber admitted he traveled under a name other than his own. He denied he consent-

ed to a search of his person, and that he declined to go with officers to get a receipt, but admitted he consented to accompany officers to the Delta room. Jaber denied saying the money he carried belonged to his brother. He denied that while he was at the airport he knew Younes had been arrested for attempting to sell methamphetamine. He also denied that he was the person interdicted on May 16, 1997, at the Dallas–Fort–Worth Airport. Jaber averred in an affidavit that he used the airline ticket purchased by his brother, Samir Y. Jaber, and did not bother to change the name.

In Younes' responses to the Government's request for admissions, he admitted he did not know names of business contacts when he was at the airport. He also admitted to consenting to a search of his person, but denied he agreed to accompany officers to the Delta room. He admitted that he declined a receipt. Younes denied that he told officers he had never been arrested because he could not recall what he said. He admitted he had been arrested for attempting to sell methamphetamine, but denied he was charged. Younes also denied telling officers he earned $90,000 from his work at the casino, but admitted that at the time of the airport incident he was no longer employed there and he only earned minimum wage there.

The Government, in response to Claimants' request for production of documents, admitted that Jaber had no federal or California criminal record. It also admitted it did not test the currency for narcotics residue because the currency was in bank wrappers and Jaber had indicated that it had recently been withdrawn from the bank, and admitted the currency was

not presented to a canine. Finally, the Government provided only three names of persons related to or associated with Jaber who are also associated with methamphetamine traffickers: (1) Wiam Younes a/k/a William "Bill" Younes of 2130 West Crescent Avenue, Anaheim, (2) Atef Wassel Abu–Jaber a/k/a Atef Abu Jaber a/k/a Atef Yousef Jaber a/k/a Sam Jaber a/k/a Assif Hussain Jaber of 1244 Falstone Avenue, Hacienda Heights,[3] and (3) Ata Zalen Mohammad Dighlawi a/k/a Joe Icar a/k/a Ata Dighlawi of 1339 Pearl Avenue, Escondido. In other words, the Government ties Jaber to the drug trade by listing Jaber, himself, Younes, and Dighlawi. Claimants were never arrested or charged with any crime in connection with the seizures.

*Procedural History:* After the seizure on January 20, 1998, the currency was initially sent to DEA headquarters for administrative forfeiture. After receipt of notices of seizure, Claimants submitted sworn claims of ownership on April 6, 1998. Thereafter, the matters were referred to the United States Attorney to initiate civil forfeiture proceedings, and, on June 10, 1998, the Government initiated civil actions *in rem* to forfeit the currency. On June 26, 1998, the court found probable cause for the seizures under 21 U.S.C. § 881(a)(6), and reasonable cause for the seizures under 28 U.S.C. § 2465. Thus, it entered a Warrant of Arrest In Rem directing U.S. Marshals to seize the currency.

Both Claimants then filed claims of ownership and answers to the complaints contesting the seizures and forfeitures. The parties engaged in discovery, including requests for admissions, requests for produc-

---

**3.** The aliases Atef Wassel Abu–Jaber and Assif Hussain Jaber are not among the aliases in the report. *Compare* J.A. 133, *with* J.A. 122.

tion of documents, and interrogatories, as discussed *supra.*

Thereafter, Claimants moved to suppress evidence and for summary judgment. They asserted there was no probable cause for the seizures because the officers only had a suspicion of wrongdoing, there were mistakes of information (principally that Jaber was not NADDIS-positive), currency is not contraband, and the currency could not be shown to be evidence of crime at the time it was seized. Claimants also argued there was no probable cause for forfeiture because the Government could not show the requisite substantial nexus between the currency and drug trafficking. Finally, they argued the delay of about five weeks between the seizure and initiation of forfeiture proceedings was a denial of due process entitling them to dismissal.

The Government also moved for summary judgment. It argued Claimants could not show their money was not used for drug trafficking, and that "[t]he facts are conclusive that the currency was used, or intended to be used, in exchange for controlled substances." J.A. 300, 304. The Government specifically relied on the previously issued Warrant of Arrest In Rem to establish probable cause for the forfeitures.

In its response to Claimants' motion, the Government argued there was probable cause for the seizure and the forfeiture, but it provided no distinct analyses for these separate issues and it made almost no attempt to distinguish the two seizures and forfeitures at issue. The Government also argued that the delay in instituting forfeiture proceedings was not a denial of due process.

In Claimants' response to the Government's motion, they asserted that the Government could not rely on the previous *ex parte* probable cause finding for the seizures to support a probable cause finding

for forfeiture. They reiterated that the Government failed to establish probable cause for the seizures or forfeitures, and that there were factual issues not within the court's prerogative to determine.

After a hearing, the district court granted the Government's motion for summary judgment, and denied Claimants' motions to suppress and for summary judgment.

## II. Legal Issues

As *United States v. One 1974 Learjet 24D,* 191 F.3d 668, 672 (6th Cir.1999), made clear, a seizure, arrest warrant in rem, and forfeiture proceeding "each implicate different bodies of law, have different goals, and require different evaluations of probable cause." Absence of probable cause for the seizure may permit return of the property to its owner, but it does not end forfeiture proceedings. *Id.* at 673. Rather the absence of probable cause for a seizure may simply result in suppression of that evidence in a forfeiture proceeding. However, the failure to establish the requisite probable cause for forfeiture precludes forfeiture. *Id.*

Claimants challenge only the seizures and forfeitures. The Government discusses probable cause in only a generic sense, and makes no attempt to distinguish the different standards. Under *Learjet,* this is improper. Also, the court did not treat the two cases separately. Thus, as with the factual background, we discuss the law and its application to the instant cases at some length because the Government and the court did not do so properly.

## A. Probable Cause for Seizure

This court reviews a district court's factual findings on suppression issues for clear error and the court's conclusions of law *de novo. United States v. Baro,* 15 F.3d 563, 566 (6th Cir.1994). "Absent val-

id consent, the government must establish that [a] warrantless seizure was justified by probable cause." *Id.* at 567 (citing *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) (recognizing that a greater expectation of privacy exists in property that is carried on one's person so that probable cause is required). Probable cause, in this context, "means a reasonable ground for belief that the item seized is contraband or evidence of a crime." *Id.* This reasonable ground for belief of guilt must be supported by "more than mere suspicion." *United States v. Fifty-three Thousand Eighty-Two Dollars in U.S. Currency ($53,082)*, 985 F.2d 245, 249 (6th Cir.1993). Although each piece of evidence is reviewed, it is considered in the aggregate when determining whether probable cause existed. *Baro*, 15 F.3d at 568.

Because currency is not contraband, *id.*, the Government must show it had probable cause to believe the currency was evidence of a crime. Although drug profile characteristics provide some objective basis for such suspicion, courts should hesitate to overly rely on them because a profile includes behavior attributable to perfectly legal activity. *$53,082*, 985 F.2d at 249. Similarly, although false or evasive statements may indicate criminal activity, they must be viewed in conjunction with the drug courier profile to determine whether they merely provide "inchoate and unparticularized suspicion," or the requisite probable cause. *See id.* at 250.

The district court ruled it would scrutinize the seizure as if it were non-consensual because the record was unclear regarding consent,[4] and concluded there was

probable cause for the seizure. The court noted three categories of evidence supporting the finding: (1) a drug courier profile, (2) information gleaned from the interview at the coffee shop, and (3) information gleaned from the interview in the Delta room. In particular, the court noted Claimants met the drug profile because they traveled from a known drug source city to one known for drug activity and purchased the tickets with cash shortly before the flight. It also noted that, during the coffee shop interview, officers discovered Jaber was flying under a false name, both men disclosed they were carrying large sums of cash, and neither could provide details of their purported business opportunity. The court reasoned these lines of evidence provided officers with a reasonable basis for suspicion that Claimants were involved in drug-related activity, so the encounter could continue in the Delta room. The court then reasoned that information from the interview in the Delta room, such as the positive NADDIS history coupled with Younes' denial of ever having been arrested, and Claimants' inability to explain fully the source or intended use of the money, was sufficient to give the officers probable cause to seize the currency. The court discounted that Younes traveled under his own name, the lack of contraband, and the general unreliability of NADDIS reports.

Claimants argue there was no probable cause for the non-consensual seizure of currency from either Claimant because the Government only had suspicion of criminal activity. Therefore the evidence should have been excluded. The Government, on the other hand, insists there was probable cause for the seizures. The Government

---

4. The Government in its pleadings below and its brief on appeal states that "Claimants were advised that the money would be detained based upon probable cause that it was used or intended for use in trafficking of controlled substances." J.A. 297, Final Br. of the U.S., at 8. Because such a declaration leaves no room for consent, *Baro*, 15 F.3d at 567, the district court properly addressed the issue as one of probable cause to seize.

further argues that, in addition to the facts mentioned by the court, it is relevant that Claimants' tickets had a return flight eleven hours later and that they did not check any luggage. The Government also asserts that Jaber's acknowledgment in the coffee shop that the money was not his, but his brother's is relevant, as well as that Jaber "concealed" his currency in more than one place, especially in his socks. As will be discussed shortly, these facts are unremarkable. The Government also relies on the subsequent *ex parte* Warrant for Arrest In Rem determination of probable cause, neglecting to discuss in a meaningful way whether there was probable cause for the seizures at the time of seizure.

1. Younes' $4,600

■ The facts known to the officers at the time of the seizure do not amount to a reasonable ground for belief that Younes' currency is evidence of a crime. Younes traveled under his own name, gave valid identification, acknowledged carrying a large sum of cash when asked, stated it was his own money, and removed it from his pants' pocket. None of this is remarkable, except for the fact that the sum was nearly $5,000. Although Younes traveled from a known drug source city,[5] probably every major city in this country is known for some sort of drug activity. That he checked no luggage is not suspicious because he had a return flight the same day so that an overnight bag was unnecessary. Numerous business people travel by plane every day to the major cities in this country expecting to return the same day.

Thus, the lack of luggage and short stay is also unremarkable.

TFO Parker did not make many inquiries of Younes' source of money, apparently being satisfied with his statement that he earned $90,000 annually, and it was not until a later admission during the forfeiture proceedings that it was discovered he only made minimum wage. This subsequent information cannot be used to justify the seizure, however.

The only substantial bases for *suspicion* are Younes' negative response when asked if he had been arrested, and the positive NADDIS history that reflected he had an arrest for methamphetamine, coupled with tickets purchased with cash less than twenty-four hours before departure. Nevertheless, his NADDIS history did not show Younes had been convicted or even charged, and the information regarding his cooperation in exchange for no charges being filed was obtained through subsequent investigation so that it was not known at the time of the seizure. Moreover, although the circumstances surrounding the purchase of the tickets fit the profile, no law requires purchase of tickets with a credit card or a check, or that tickets must be purchased well in advance of a trip. Importantly, traveling in his own name destroyed anonymity and significantly contradicts the behavior normally associated with a drug profile. *Baro*, 15 F.3d at 568. Finally, Younes had no contraband on his person at the time of the seizure, and the two counterfeit bills were not discovered until later.

These facts, even in light of the drug courier profile,[6] are not more than an "in-

---

**5.** The Government's characterization of Columbus as a supply city for chemical precursors of methamphetamine to support the drug courier profile and the seizures at issue here is problematic. The record shows that the conversations with Ohio authorities establish-

ing this fact took place during the subsequent investigation.

**6.** To the extent the profile may include the information that drug trafficking organizations were using people without criminal or

choate and unparticularized suspicion." At best, there was a hunch Younes was involved in the methamphetamine trade because he was once arrested. The facts here are similar to *$53,082*, where this court found no reasonable suspicion for the warrantless seizure, much less probable cause. *$53,082*, 985 F.2d at 248–50 (involving travel between two known drug activity cities on tickets paid with cash the same day, with a return flight for the next day and no checked luggage, men carrying all the cash in their socks, and statements that they intended to invest the money obtained from their jobs and lotto winnings in a limousine service); *see also United States v. $7,850 in U.S. Currency*, 7 F.3d 1355, 1358 (8th Cir.1993) (holding no probable cause; where NADDIS-positive claimant gave false and evasive answers, purchased ticket with cash the day of flight, and had no luggage or identification). We find the same conclusion is warranted here.

### 2. Jaber's $30,000

■ Facts pertaining to Clamaint Jaber are more complicated. Jaber, unlike Younes, traveled under a false name. Nevertheless, he produced his own identification when asked and had an explanation for the different name, i.e., that he was using his brother's ticket. This explanation, however, is not entirely plausible where Jaber also stated his brother could

not use the ticket because he had to attend a funeral, and where it was purchased twenty-four hours prior to the flight. This is just a basis for suspicion.

Moreover, although Jaber readily acknowledged carrying a relatively large sum of cash, he indicated it was not his own money, but his brother's money.[7] This, too, raises suspicion about why someone would travel with such a large amount of someone else's money. Later, when he removed the money, he took it not only from his business suit, but also took one packet from one of his socks. Nevertheless, overall, how Jaber carried the $30,000 does not seem particularly suspicious. Even if carrying money in one's sock is perhaps odd, no reasonable person would walk around with cash just dangling out for everyone to see. Rather, one would naturally put it where it could not be easily stolen. Moreover, the money was readily produced, and was not disguised or taped or otherwise strapped to his person. In fact, the currency was in bank wrappers, indicating it had recently been withdrawn.

Jaber also did not provide very good answers regarding his intended use or purpose for the money. Although he revealed an interest in purchasing a business, it was unrelated to his current occupation, and he told officers in response to a question that he did not "know anyone" in Columbus. This too is suspicious, especially in light of the fact that the money apparently was not

---

drug histories to courier drugs or currency, it is problematic because it is also based on subsequent investigations. This latter aspect of the profile is especially troubling because it is an after-the-fact justification for seizing assets from individuals based on their *lack of* criminal activity. We find this so troubling because, under the Government's view, it could seize currency from essentially everyone at airports in major cities on the basis of their completely clean records when they have short turnaround flights, recently paid for, and no luggage.

7. Jaber denies he said the money belonged to his brother. In regard to the motion to suppress, the district court implicitly found the officer's affidavit more credible. This court gives deference to a district court's credibility assessment. *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir.1999) (citing *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir.1996)).

his and was of such a substantial amount. On the other hand, Jaber was not NADDIS-positive, he responded that he had not been arrested, and he did not have any contraband on his person.

As in the discussion *supra* regarding Younes, travel between major cities known for drugs, without checked luggage where there is a brief stay is, in itself, unremarkable. However, coupled with the other facts pertaining to Jaber, there is some suspicion raised. Nevertheless, the court's finding that Jaber was *unable* to explain the source or intended use of the money is inaccurate. Jaber provided explanations. They just seem somewhat implausible. That an individual is foolish in carrying a large amount of cash, or is foolish in traveling so far away to go cold-calling for investment opportunities is insufficient to rise to the level of probable cause that he is involved in the illegal drug trade. Moreover, it is not so implausible as to rise to the level of probable cause of drug trafficking that small businesses, such as convenience stores, would be marketed on the spot for cash, especially among fellow members of an immigrant community.

In short, there was nothing specifically tying Jaber to the drug trade. Although Jaber was traveling with someone who was NADDIS-positive for an arrest for methamphetamine who denied ever having been arrested, his companion's behavior was otherwise totally innocuous and, significantly, the companion traveled under his own name. Again, there was no basis for this warrantless seizure because there was no probable cause that the currency was evidence of a crime. *$53,082*, 985 F.2d at 248–50; *see also $7,850*, 7 F.3d at 1358.

B. Probable Cause for Forfeiture

This court reviews a grant of summary judgment *de novo*, but a denial of summary judgment is reviewed for an abuse of discretion. *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir.1994). An abuse of discretion occurs when the lower court "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard. An abuse of discretion may also be found when the reviewing court is firmly convinced that a mistake has been made," i.e., when we are left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir.2000) (quotations and citations omitted).

Summary judgment is proper where the pleadings, affidavits and other materials in the record show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When a motion for summary judgment is made and supported by competent admissible evidence, the non-movant may not rest on his pleadings but must come forward with affidavits or other admissible evidence setting forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which factual disputes are material. *Id.* at 248, 106 S.Ct. 2505. To determine whether a factual dispute is genuine the court inquires "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The evidence of the non-movant must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Id.* at 255, 106 S.Ct. 2505.

Property is subject to forfeiture when (1) it is furnished or intended to be furnished in exchange for a controlled sub-

stance, (2) it represents proceeds traceable to such an exchange, or (3) it is used or intended to be used to facilitate illegal drug-trafficking. 21 U.S.C. § 881(a)(6). Probable cause sufficient to justify forfeiture is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *$53,082*, 985 F.2d at 250 (quoting *United States v. $22,287.00, U.S. Currency*, 709 F.2d 442, 446 (6th Cir.1983)). In addition, under § 881(a)(6), the government must show "probable cause of a substantial connection between the property and the underlying criminal activity," *id.* (quoting *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1136 (6th Cir.1989)) (quotations omitted), which here is that the currency was intended to be used to facilitate illegal drug trafficking. The probable cause determination is made based on the information existing at the time of forfeiture, not just at the time of seizure, so that information gleaned from subsequent investigation is included. *Id.* Once the government establishes probable cause for forfeiture, the burden shifts to the claimant to prove innocent ownership of the currency. *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 287 (6th Cir.1992).

Here, the district court found that "[t]he evidence which supported the finding of probable cause in the prior section of this order addressing seizure also underpins the finding of probable cause for the forfeiture." J.A. 434. The court further found that the Government tied Claimants "to the drug trade, both by pointing to Younes's arrest and subsequent deal and by showing numerous links between Jaber and others in the business of dealing drugs." J.A. 434. The court therefore concluded the Government met its burden of showing a substantial connection existed between the currency to be forfeited and the illegal exchange of a controlled substance. The court then found Claimants

failed to show innocent ownership, and failed to show "a legitimate, non-drug-related source of the funds nor suggested a similar purpose to which it would be put." J.A. 435. Thus, it entered summary judgment in favor of the United States.

The Claimants argue that the Government did not show it had probable cause to support forfeiture so that the district court erroneously granted summary judgment in favor of the Government. For its part, the Government argues that it demonstrated probable cause so that the burden shifted to Claimants to establish a legitimate source of the money and a legitimate intended use for it, and asserts the Claimants failed to meet their burden so that summary judgment in its favor was proper.

### 1. Younes' $4,600

■ Here, by the time of the forfeiture proceeding, the subsequent investigation revealed no additional records in crime databases for Younes other than the information known at the time of the seizure. Although NWCCC searches by Younes' surname yielded a few entries, none were for the address he provided. Moreover, although the Government suggests there might be a link between Ata Dighlawi, who was interdicted at the Dallas–Fort Worth Airport in June 1997, and someone with the names of Younes and Eliya, who was the subject of drug investigation surveillance in September 1997, the Government does not allege that the Eliya names are aliases of Claimant Younes. Similarity of names is not sufficient to connect someone to illegal activity when the Government does not even allege the names belong to the same person and there is no other evidence from which to reasonably infer that the individuals are the same person. More importantly, the records do not reveal that Dighlawi or Eliya were ever

charged or convicted of drug offenses, or that the currency seized from Dighlawi was ever successfully forfeited.

The only tie to drug trafficking is Younes' California arrest. Yet, he was never even charged, much less convicted. Coupled with the facts discussed *supra,* pertaining to the motion to suppress, the Government still only has mere speculation to support this forfeiture action. This case is not unlike *$53,082,* in which men traveled between two known drug activity cities on tickets paid with cash the same day, who had a return flight for the next day and no checked luggage, who carried all the cash in their socks, and said they intended to invest the money obtained from their jobs and lotto winnings in a limousine service. *$53,082,* 985 F.2d at 247. In that case, which involved significantly larger sums of money than here, we found the government failed to meet its burden of showing probable cause for forfeiture. *Id.* at 251. Nor does this case rise to the level of the facts in *United States v. $5,000 in U.S. Currency,* 40 F.3d 846, 848–50 (6th Cir.1994), where the government had a stronger case than here, but where we reversed a grant of summary judgment in favor of the government. In *$5,000,* authorities had received a tip about a drug courier, the men traveled to New York for just one day with currency bundled in rubber bands, a narcotics detection dog alerted to the currency, one of the men lied about the purpose of his trip, and one of the men had pleaded guilty to a state drug offense six years earlier. *Id.* at 848–49.

In short, the Government's facts here, even if taken as true, "present only some suspicion that [Younes was] involved in some drug transaction.... [A]lthough probable cause requires less than a prima facie case, it does require more than mere suspicion." *$53,082,* 985 F.2d at 251.

Therefore, Younes was entitled to judgment as a matter of law because the Government failed to satisfy its burden of showing probable cause of a substantial connection between the $4,600 and the alleged underlying criminal activity. Likewise, the Government's motion for summary judgment was erroneously granted.

### 2. Jaber's $30,000

■ Again, facts pertaining to Clamaint Jaber are more complicated. Here, by the time of the forfeiture proceeding, the subsequent investigation of Jaber purported to establish a number of connections to drug trafficking. However, the Government admitted that Jaber did not have a federal or California criminal record, and the NWCCC, and Los Angeles and Columbus authorities had no drug-related intelligence information on him. Yet, the purported connections seem to be to other individuals with similar names.

For example, the link to the purported drug trafficker Dighlawi is established via (1) Jaber's wife's maiden name, which is controverted by the rather strong evidence of a marriage certificate reflecting that Digwali is not her maiden name, and which is undermined by the lack of documentation by the Government regarding its source of her maiden name; and (2) an address for Dighlawi that matches an address for one "Atef Jaber," but which is an address that comes up in no other database as linked with Jaber, and which does not match the address on any of Jaber's official documents. Significantly, the NADDIS information only indicated Dighlawi had been arrested on three occasions and that he was interdicted and currency was seized from him, but it does not show that Dighlawi was ever charged or convicted, or that the seized currency was subsequently successfully forfeited to the government. Further, even assuming

Dighlawi is associated with the illegal drug trade, that Dighlawi is also associated with a pharmaceutical company that sells legal drugs and that is located an hour from Columbus, does not substantially link Jaber to illicit drug trafficking merely because he was flying to Columbus. Nor does the alleged link between Dighlawi and Eliya and the drug trade establish such a link to Jaber because the Government does not allege Eliya is an alias for Claimant Younes. Moreover, there is no evidence that Eliya was ever charged or convicted of drug offenses.

Further, the EPIC report does not link Jaber to drug trafficking except by numerous inferences, based on an undisclosed address, that Jaber was the man interdicted at the Dallas–Fort Worth Airport—an inference that must be soundly rejected given the Government's concession at oral argument that these are not the same men. Moreover, as with the information for Dighlawi and Eliya, the EPIC information for Abu–Jaber does not indicate whether Abu–Jaber was charged or convicted, or whether the seized currency was subsequently successfully forfeited. That EPIC showed Jaber may have submitted a false social security number and date of birth is perhaps indicative of some sort of illegal activity, but not drug trafficking. Even Jaber's travel with Younes, who only has an arrest for a drug offense, is insufficient to link Jaber to drug trafficking.

Thus, as with Younes, the additional evidence from further investigation failed to show probable cause that Jaber was substantially connected to drug trafficking. *$5,000*, 40 F.3d at 848–50; *$53,082*, 985 F.2d at 251. The Government's evidence is essentially inference piled on inference that is, without more, insufficient to link the $30,000 to an intention by Jaber to facilitate trafficking in methamphetamines. Again, coupled with the facts discussed *supra*, pertaining to the motion to suppress, the Government has nothing but mere speculation to support this forfeiture action. As with Younes, the Government's facts, even if taken as true, "present only some suspicion that [Jaber was] involved in some drug transaction.... [A]lthough probable cause requires less than a prima facie case, it does require more than mere suspicion." *$53,082*, 985 F.2d at 251. Therefore, Jaber was also entitled to judgment as a matter of law. Likewise, the Government's motion for summary judgment should not have been granted.

### C. Violation of Due Process

■ Claimants argue on appeal that there was an unreasonable, unjustifiable delay in filing the forfeiture complaints which violated their due process rights so that the actions should have been barred.

Claimants are correct that proceedings for civil forfeiture must be instituted "promptly," 21 U.S.C. § 881(b), and that post-seizure delays implicate the Fifth Amendment's protections against the deprivation of property without due process of law, *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850)*, 461 U.S. 555, 562–64, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). However, our review of the record convinces us neither Claimant was denied due process by the Government's nearly five-month delay. *Id.* at 569–70, 103 S.Ct. 2005 (involving 18–month delay and $8,850); *see also United States v. Real Property 35555 Little Mack*, 211 F.3d 1271, No. 98–1069, 2000 WL 571985 (6th Cir. May 5, 2000) (unpublished per curiam) (twenty-nine month delay not unreasonable); *Bush v. Banks*, 181 F.3d 100, No. 98–5267, 1999 WL 313883 (6th Cir. May 5, 1999) (unpublished per curiam) (finding 10–month delay significant but not unreasonable).

### III. Conclusion

For the foregoing reasons, we RE-VERSE and REMAND to the district court to enter judgment for Claimants. We further order the district court to ensure that the currency is returned to Claimants without delay.